298

In the Matter of the Application of UNION PACIFIC MOTOR FREIGHT COMPANY for a Certificate of Convenience and Necessity to Operate as a Common Motor Carrier of Property in Intra-State Commerce. UNION PACIFIC MOTOR FREIGHT COMPANY,

*Applicant and Respondent,*

vs.

GALLAGHER TRANSFER AND STORAGE COMPANY, EMIL ZUECK, d. b. a. Zueck Transfer Company, CHRISTIAN BUNNING, dba John Bunning, EMMA BERTAGNOLLI, PARTAIN, d. b. a. ROCK SPRINGS-SUPERIOR STAGE LINES, MELVIN PRIQUET( d. b. a. Platte Valley Express and the COMMON CARRIERS DIVISION OF THE WYOMING TRUCKING ASSOCIATION, a Corporation,

*Protestants and Appellants.*

(No. 2597; December 8th, 1953; 264 Pac. (2d) 771).

For the appellants the cause was submitted upon the brief of George F. Guy of Cheyenne, Wyoming and J. R. Armstrong of Rawlins, Wyoming, Mary Ellen Crowley of Cheyenne, Wyoming, of Counsel; and oral argument by Mr. Guy.

For the applicant and respondent the cause was submitted upon the brief of Loomis, Lazear & Wilson of Cheyenne, Wyoming; W. H. Fitzpatrick of Omaha, Nebraska of Counsel; and oral argument by Mr. John U. Loomis and Mr. Fitzpatrick.

300

302

## OPINION

RINER, Justice.

This case originated before the Public Service Commission of the State of Wyoming and was there entitled:

"In the Matter of the Application of UNION PACIFIC MOTOR FREIGHT COMPANY for a Certificate of Convenience and Necessity to operate as a Common Motor Carrier of property in Intrastate Commerce.
UNION PACIFIC MOTOR FREIGHT COMPANY,

*Applicant and Respondent,*

No. 2597

vs.

GALLAGHER TRANSFER AND STORAGE COMPANY, et al

*Protestants and Appellants."*

For convenience and brevity the Union Pacific Motor Freight Company will usually be designated herein as "the applicant" or "respondent." The Gallagher Transfer and Storage Company will be herein mentioned usually as the "protestant" or the "appellant". When necessary the other Protestants and Appellants will be

described by their respective corporate names. The Wyoming Public Service Commission aforesaid will be mentioned as the "Commission."

As may be gleaned from the title aforesaid the appelcant sought a Certificate of Convenience and Necessity to conduct the business of a common carrier over certain highways of this state which will be listed in said application hereinafter set forth as disclosed by the record herein. Certain property is also sought to be excepted as not to be the subject of applicant's operations. Several abbreviations will, at this point, be expanded for the better understanding of what may appear subsequently herein: L.C.L. will be used to refer to "less-than-carload" traffic or shipments; M.C.C. will refer to citations to case series known as "Motor Carrier Cases." It may be noted also that a hearing was had for the information of the Commission concerning the contentions and issues submitted by the respective parties. This hearing was held at Rawlins, Wyoming, commencing on July 19, 1951, and concluding on July 21, 1951. The hearing which lasted for some two and a half days produced some 555 pages of transcribed testimony. This testimony was originally taken in shorthand by two persons: Lanceford Bjella, the official court reporter of the 2nd Judicial District of Wyoming, and Lucille Rath, a shorthand reporter of Denver, Colorado, in the employ of the Commission. When necessary the separate portions of the transcript bearing each their own certification will be referred to as the Bjella transcript and the Rath transcript. A verbatim copy of the application of the respondent, omitting signatures and verification which was submitted to the Commission under date of May 9, 1951, is as follows:

"APPLICATION

TO THE PUBLIC SERVICE COMMISSION
OF WYOMING
CHEYENNE, WYOMING.

Applicant states:

The full and correct name of applicant is UNION PACIFIC MOTOR FREIGHT COMPANY.

Applicant is a corporation incorporated under the laws of Nebraska on April 27, 1948, operating under the name or style of Union Pacific Motor Freight Company. Names and addresses of its officers are: A. J. Seitz, President; P. J. Lynch, Vice-President; C. C. Weedin, Vice-President; C. G. Kullman, General Manager; C. B. Matthai, Secretary; R. M. Sutton, Auditor; L. L. Burri, Treasurer.

The post office address of applicant is 1416 Dodge Street in Omaha, Nebraska, and all officers are located at that address.

Applicant proposes to operate as a common carrier by motor vehicle for the transportation of general commodities, except household goods as defined in *Practices of Motor Common Carriers of Household Goods*, 17 M.C.C. 467, petroleum products in bulk in tank trucks, and commodities which because of their size or weight require the use of special equipment, in highway motor service supplemental and auxiliary to and coordinated with L.C.L. freight service of the Union Pacific Railroad Company, over regular routes, engaging in the same operation on return movements, which highway routes are shown in red on map identified as Exhibit 1, and more fully described on Exhibit 2, hereto attached. Exhibit 1 also shows the rail lines of the Union Pacific Railroad Company which parallel or are

in close proximity to the highways over which applicant proposes to operate under this application. Applicant desires to serve all Union Pacific stations or points on the highways specified on Exhibit 2 and shown in red on map Exhibit 1, and also all off-route stations or points which are rail stations or points on the rail lines of the Union Pacific Railroad. The map (Exhibit 1) does not in every instance indicate the exact road or highway leading from the main highways shown in red to the smaller off-route stations or points served by the Union Pacific Railroad which applicant desires to also serve under this application. The proposed operation will be conducted year-round, generally on a daily basis, except Saturdays, Sundays and Holidays, with non-scheduled service to the smaller branch line points as the tonnage and other requirements indicate. Tentative schedule of operations is attached as Exhibit 3.

Applicant proposes to use seven (7) tractors and nine (9) semi-trailers in the above-described service. A complete list of such highway equipment will be filed with the Commission before commencing operations.

Applicant is financially responsible, being a wholly owned subsidiary of the Union Pacific Railroad Company. Copy of applicant's general balance sheet and income account statement as of December 31, 1950, is attached identified as Exhibit 4.

Applicant is prepared to obtain and file with the Commission all insurance policies required by law and will keep the same in full force and effect during the length of time applicant operates as a common carrier by motor vehicle in intrastate commerce.

Applicant will comply with all the provisions and requirements of the laws of the State of Wyoming relative to the operations of motor vehicles for hire and will comply with all rules and regulations promulgated

by the Public Service Commission of Wyoming.

The existing transportation facilities in the territory proposed to be served are as follows:

Union Pacific Railroad Company provides transportation service by rail on less-than-carload shipments to and from all of the stations and points involved in this application. In addition the following motor common carriers of freight provide transportation to some of the points involved:

Gallagher Transfer and Storage Co., 2424 Arapahoe Street, Denver, Colorado; Interstate Motor Lines, Inc., 235 W. Third Street, So. Salt Lake City 1, Utah; Emil Zueck, Rock Springs, Wyoming; Arrowhead Truck Line, Kemmerer, Wyoming; Star Transportation Company, Kemmerer, Wyo.; Superior Stage Lines, Rock Springs, Wyoming; Saratoga Truck Line (Clarence Shaw) Saratoga, Wyoming; Platte Valley Express (Oscar Priquet) Encampment, Wyoming; Denver-Laramie-Walden Truck Line, Inc., 2921 Walnut Street, Denver, Colorado; Pacific-Intermountain Express Co., 299 Adeline Street, Oakland 20, California; Salt Creek Freightways, Casper, Wyoming.

Competition between such carriers will not be increased for the reason that Union Pacific Railroad Company is already providing service by rail on less-than-carload shipments, which shipments will be handled in truck service auxiliary and supplemental to such rail service of the Union Pacific Railroad Company if this application is approved.

The public convenience and necessity require the proposed service.

Applicant will handle less-than-carload shipments of freight in service strictly auxiliary and supplemental to

the rail service of Union Pacific Railroad Company, thereby greatly improving the service on such shipments.

Application to the Interstate Commerce Commission for authority to render the same type of service on interstate shipments was filed and after hearing thereon the authority sought was granted by the Commission in Docket MC-110388 and certificate authorizing such service has been issued. From previous experience on other portions of the Union Pacific Railroad it has been demonstrated that establishment of the auxiliary and supplemental highway service expedites the delivery and assembly of less-than-carload shipments by as much as one to three or more days; that elimination of less-than-carload peddling from freight trains results in improved service on carload shipments and in better switching services, and also results in the saving of a substantial number of freight cars for use in loading carload traffic.

The freight house facilities and personnel of the Union Pacific Railroad Company will continue to handle the receipt, billing and delivery of L.C.L. freight handled in the coordinated highway service. Pick-up and delivery services on such shipments will be continued as provided by tariff.

All shipments handled in the proposed auxiliary and supplemental highway service will move at rail rates, on rail billing and only to and from rail stations of the Union Pacific Railroad Company in the territory above mentioned.

Required fee of $5.00 for application for certificate of public convenience and necessity is attached.

WHEREFORE, applicant prays that the Commission grant a certificate of convenience and necessity to oper-

rate as a common carrier by motor vehicle in intrastate commerce as above set forth, and also a permit to perform similar service with respect to interstate traffic.

Dated at Omaha, Nebraska, this 9th day of May, 1951."

Relative to this application the Commission after reviewing the several transcripts (Bjella and Rath) with their exhibits aforesaid disposed of it by a signed statement followed by sundry orders as follows:

"IN THE MATTER OF THE APPLICATION OF THE UNION PACIFIC MOTOR FREIGHT COMPANY, A CORPORATION FOR AUTHORITY TO CONDUCT OPERATIONS AS A COMMON CARRIER BY MOTOR VEHICLE FOR THE TRANSPORTATION OF GENERAL COMMODITIES, EXCEPT HOUSEHOLD GOODS, PETROLEUM PRODUCTS, IN BULK, IN TANK TRUCKS, AND COMMODITIES WHICH BECAUSE OF THEIR SIZE AND WEIGHT REQUIRE THE USE OF SPECIAL EQUIPMENT, IN HIGHWAY SERVICE SUPPLEMENTAL AND AUXILIARY TO AND COORDINATED WITH L.C.L. FREIGHT SERVICE OF THE UNION PACIFIC RAILROAD COMPANY, OVER REGULAR ROUTES, ENGAGING IN THE SAME OPERATION ON RETURN MOVEMENTS. ) DOCKET NO. M. 17818.

ORDER APPROVING APPLICATION OF THE UNION PACIFIC MOTOR FREIGHT COMPANY—

DOCKET M-17818

BY THE COMMISSION:

On the 9th day of May, 1951, this matter came on regularly for consideration by the Commission upon the application of Union Pacific Motor Freight Company, a

Nebraska corporation, qualified to do business within the State of Wyoming. Said applicant requests authority to conduct operations as a common carrier by motor vehicle for the transportation of general commodities, except household goods, petroleum products, in bulk, in tank trucks, and commodities which because of their size and weight require the use of special equipment, in highway motor service, supplemental and auxiliary to and co-ordinated with L.C.L. freight service of the Union Pacific Railroad Company, over regular routes, engaging in the same operation on return movements, from and to the following designated localities, and over the following designated highways.

> From Laramie, Wyoming, over U. S. Highway 30 to Rawlins, Wyoming.
>
> From Wolcott, Wyoming, over Wyoming Highway 130 to junction Wyoming Highway 230, thence over Wyoming Highway 230 to Encampment, Wyoming.
>
> From Thayer Junction, Wyoming, over U. S. Highway 30 to Little America, Wyoming, thence over U. S. Highway 30-N to Border, Wyoming.
>
> From Thayer Junction, Wyoming, over unnumbered Wyoming Highway to Superior, Wyoming.
>
> From Rock Springs, Wyoming, over unnumbered Wyoming Highway to Winton, Wyoming.

Applicant desires to serve all Union Pacific stations and points on the highways as specified above, and also all off-route stations or points which are rail stations or points of rail-lines of Union Pacific. The proposed operation will be conducted the year round generally on a daily basis except Saturday, Sunday and holidays with non-scheduled service to the small branch lines as the tonnage and other requirements indicate.

SUBSTANTIAL PUBLIC BENEFITS — Protestants contend that the service now being rendered by certified motor freight carriers is entirely adequate, and therefore, the public convenience and necessity does not require additional motor vehicle service over the high-

ways. The protestants also contend that the granting of this authority to the Union Pacific Motor Freight Company would be injurious and detrimental to their respective interests. The applicant submitted testimony of fifteen witnesses from all sections of the state along their proposed route of operation, who testified that the proposed service would be of substantial benefit to the public, and that there was a demand for such service. It is true that some of the witnesses testified that some of the existing carriers were rendering satisfactory service. The evidence also shows that this proposed motor service would be without any additional cost to the shipping public, and would result in a substantial saving to the Union Pacific Railroad Company, of which applicant is a wholly owned subsidiary. The Union Pacific Motor Freight Company is at present operating motor vehicles over the same route under authority granted to them by the Interstate Commerce Commission to carry interstate freight. The same vehicles now being used on this route in the carrying of interstate commodities would be used to carry intrastate commodities of less-carload-traffic of the Union Pacific Railroad Company. Said proposed activity by applicant would not result in any additional investment outlay of capital for new vehicles.

SUPPLEMENTAL OPERATIONS—The extent of the highway operative right herein sought and the history and operations of the Union Pacific Railroad Company should be borne in mind. The Union Pacific Motor Freight is not seeking to serve new points. It is merely endeavoring to improve existing service on less-carload-traffic by means of motor vehicle. The Union Pacific Motor Freight Company offers to serve to and from stations on the Union Pacific Railroad main and branch lines.

IMPROVEMENT OF SERVICE — The record shows that the Union Pacific Motor Freight Company, if it receives the certificate sought, will transport intrastate less-carload-traffic by truck, and the Union Pacific Railroad will continue to carry carload merchandise by rail. No dual operation or competition with itself would result from such a method of handling. While it is possible for the Union Pacific Railroad Company to trans-

port less-carload-traffic either by rail or truck, the necessity for speed in transit prevents this use of rail cars if its service is to be competitive with other transportation companies. The Union Pacific Motor Freight Company states unequivocally that it seeks the within highway common carrier certificate to enable it to augment and improve the existing rail service of its parent company. Such a certificate would permit the Union Pacific Freight Motor Company to accord direct truck service to rail points, thus avoiding the necessity of stopping cars at brake (break) bulk points and hauling back to destinations with the subsequent delay in transit. Further, it would make it necessary to engage in the uneconomical operation of partially filled rail or box cars.

COMPETITIVE EFFECTS—The present motor carriers seek to prevent the Union Pacific from competing effectively with them for less-carload traffic. Their position in this respect is understandable, but such self-interest should not be confused with the general public interest. These truck carriers apparently fear that if this application is granted, the rail carriers will gain a substantial monopoly of the transportation business in this section of the state. There is no solid basis in the evidence for such apprehension. The record shows that the Union Pacific Railroad Company and the protesting carriers are at present competing for the transportation of intrastate commodities. The record further shows that if this application were granted, this would not unduly add to the competition presently existing between the Union Pacific Railroad Company and the present existing carriers.

PUBLIC CONVENIENCE AND NECESSITY — By Section 60-1305, Wyoming Compiled Statutes, which states 'In acting upon all applications for such certificates, the Commission shall take into consideration, in addition to the question of public convenience and necessity, the question of the applicant's qualifications for rendering, and his financial ability to render the necessary and proper services required to be performed.' The finding of public convenience and necessity of course includes elements, one of which is the public interest, but the ultimate is public convenience

and necessity, and the law prescribes no further requirements or standard, after finding applicant qualified, as a condition precedent to the issuance by the Commission of a certificate to operate as a highway common carrier. The Commission must consider the facts on record with respect to the general public's advantage or disadvantage resulting from the grant of such authority.

CONCLUSION — After considering the evidence of record and the oral argument presented, the Commission is of the opinion that the inauguration of the service proposed by the Union Pacific Motor Freight Company will afford a better service to the shipping public, and will enable the Union Pacific Railroad Company to effect substantial economies. The Commission is further of the opinion that the granting of this application to the Union Pacific Motor Freight Company will not be unduly competitive with the present existing common carriers. The Commission concludes that the public convenience and necessity require a certificate to be granted to the Union Pacific Motor Freight Company authorizing it to operate as a highway common carrier, subject to limitations specified by the Commission.

An order will be entered accordingly.

## ORDER

IT IS THEREFORE ORDERED by the Commission that said application be and it is hereby granted; that upon compliance with all provisions of the Wyoming Motor Carrier Act, and the rules and regulations prescribed by the Commission thereunder, it shall be lawful for said applicant to conduct and perform highway motor service supplemental and auxiliary to and coordinated with L.C.L. freight service of the Union Pacific Railroad Company.

IT IS FURTHER ORDERED that the Union Pacific Motor Freight Company, a corporation, is granted authority to operate as a common carrier by motor vehicle for the transportation of general commodities, except household goods, petroleum products, in bulk, in tank trucks; and commodities which because of their

size and weight require the use of special equipment, in highway motor service supplemental and auxiliary to and co-ordinated with L.C.L. freight service of the Union Pacific Railroad Company, over regular routes, engaging in the same operation on return movements, from and to the following designated localities and over the following designated highways:

From Laramie, Wyoming, over U.S. Highway 30 to Rawlins, Wyoming.

From Walcott, Wyoming, over Wyoming Highway 130 to junction Wyoming Highway 230, thence over Wyoming Highway 230 to Encampment, Wyoming.

From Thayer Junction, Wyoming, over U.S. Highway 30 to Little America, Wyoming, thence over U.S. Highway 30-N to Border, Wyoming.

From Thayer Junction, Wyoming, over unnumbered Wyoming Highway to Superior, Wyoming.

From Rock Springs, Wyoming, over unnumbered Wyoming Highway to Winton, Wyoming.

IT IS FURTHER ORDERED that applicant is *restricted* to authority to serve Union Pacific Stations, or points o nthe highways as specified in the above paragraph, and also all off-route stations or points which are *rail stations or points* on the rail-lines of the Union Pacific. (Italics already supplied.)

IT IS FURTHERED ORDERED that the motor vehicle time schedule as submitted by the applicant concerning the Laramie-Rawlins-Encampment schedule which was submitted as tentative, be and the same is hereby made permanent, and the same shall not be changed without proper authority from the Commission.

IT IS FURTHER ORDERED that in performing motor carrier service under said certificate, the Union Pacific Motor Freight Company shall observe and abide by all the terms, conditions and restrictions therein contained, and the same shall not be changed without proper authority from the Commission.

IT IS FURTHER ORDERED that Certificate of Public Convenience and Necessity No. 197 now held by the Union Pacific Freight Company be amended to include the additional authority granted by this order.

IT IS FINALLY ORDERED by the Commission that operations pursuant to said certificate shall be subject to such rules, regulations and requirements as are now or may hereafter be prescribed or adopted by the Commission.

MADE AND ENTERED at Cheyenne, Wyoming, this 8th day of January, A.D., 1952.

PUBLIC SERVICE COMMISSION OF WYOMING."

It may be mentioned here that by its later order of date January 17, 1952, the date of the Commission's final disposition of the matter was changed from January 8th, 1952, to January 15th, 1952.

From the several orders of the Commission the appellant, Gallagher Transfer and Storage Company, together with the other protestants and appellants has, as above set forth, filed under date of January 30, 1952, their amended notice of appeal which, omitting names and signatures of counsel and names of said protestants and appellants including title, reads, as follows:

"* * * do herewith give NOTICE OF APPEAL to the District Court of Laramie County at Cheyenne, Wyoming, from the Order of the Commission originally dated January 8, 1952 but changed by the Commission's subsequent Order of January 17, 1952 to read 'dated January 15, 1952,' which Order granted the application of the Union Pacific Motor Freight Company for certain common carrier motor services in Wyoming intrastate commerce, 'supplemental and auxiliary to and coordinated with L.C.L. freight services of the Union Pacific Railroad Company'; and

"THAT THIS NOTICE OF APPEAL is given under the provisions of Sections 60-1343, 60-1344, 60-1345, 60-1346, 60-1347, 60-1348, 60-1349, Wyoming Compiled Statutes, 1945, (as amended) and upon the following grounds:

"(1) THAT the Decision and Final Order of January 15th, 1952, granting the Application herein is not in conformity with law; and

"(2) THAT the Decision and Final Order of January 15th, 1952, granting the Application herein, is not supported by substantial evidence.

"and that the Appellants have heretofore filed with this Commission good and sufficient bond in the sum of $1,000.00, which is more than double the amount of the costs heretofore assessed in this proceeding, namely, $332.66 and which bond has been approved by the Commission, and have also heretofore paid to the Commission the sum of $5.00 for the cost of making a transcript and allowing said Appeal.

"DATED at Cheyenne, Wyoming, this 30th day of January, 1952."

The statutes of this state which should be kept in mind in disposing of the matter now before this court are:

"§ 60-1301. Objectives of law—The promotion of the safety of the highways, the collection of a fair and adequate compensatory fee for the commercial use of highways constructed with public money, and the maintenance of a sound, well-regulated transportation structure for the people of the state are declared to be the objectives of this law, and the provisions hereof the means to that end."

"§ 60-1302. Definitions—For the purposes of this Act (§§ 60-1301—60-1362), unless the context otherwise requires, the following terms shall be construed respectively to mean: * * * (n) Common Motor Carrier. Any person who undertakes for hire or reward, to transport, by motor vehicle on and over the highways of the state, persons or property of those who choose to employ him and who holds himself out as being willing to undertake for hire such transportation from place to place, over regular routes with fixed termini. * * *"

"§ 60-1304. Motor carriers and common motor carriers —Supervision and regulation—All motor carriers as

herein defined are hereby declared to affect or be affected by a public interest, and all common motor carriers are hereby declared to be public utilities within the meaning of all laws of the state relating to Public Utilities insofar as the same are legally applicable and not in conflict herewith and *the power to supervise and regulate all common motor carriers is hereby delegated to the Commission* and the power to supervise all other motor carriers to the Highway Department." (Italics supplied.)

"§ 60-1305. Common carriers—Certificate of convenience and necessity—Application—Matters considered. It shall be unlawful for any common motor carrier to operate any motor vehicle on any highway for the transportation of either persons or property without first having annually obtained from the commission a certificate declaring that the present or future public convenience and necessity require such operation, and without paying the fees and compensatory fees provided for herein for the use of the highways and for the maintenance, repair and reconstruction of the same, and the other fees herein required. *In acting upon all applications for such certificates, the commission shall take into consideration, in addition to the question of public convenience and necessity, the question of the applicant's qualifications for rendering, and his financial ability to render the necessary and proper services required to be performed.*" (Italics supplied.)

"§ 60-1306. Common carriers—Special terms and privileges under certificate—Presumption from operation— Certificate as matter of right. *Only the commission shall have the power to issue or refuse to issue a certificate or to issue such certificate for the partial exercise of the privilege sought and may attach to the exercise of the privilege granted by any certificate issued such terms and conditions as it may deem proper and which, in its judgment, it considers to be for the best interest of the public or what the public convenience and necessity require; * * *"* (Italics supplied.)

"§ 60-1307. Common carriers—Application for certificate. — Applications for certificate shall be made in writing and verified and shall contain the following information:

"(a) the name and address of applicant; (b) a statement of the nature of transportation service proposed; (c) a description of the route for the proposed service; (d) agreement to charge the rates and fares fixed and approved by the commission for the transportation of persons and/or property; (e) the proposed time schedule; (f) statement showing why applicant believes the public convenience and necessity require the service proposed; (g) description of the equipment to be operated; (h) complete financial statement; (i) names and addresses of all transportation agencies serving the same territory as that sought to be served; and (j) such additional information as the commission may deem necessary."

"§ 60-1308. Common carriers — Regulation by public service commission.—It shall be the duty of the commission to supervise and regulate the operations of all common motor carriers so that the safety of the highways may be preserved and a sound economic transportation structure for the state maintained in such manner as shall most effectively accomplish the objectives of the legislative declaration of policy in Section 1 of this Act (§ 60-1302), and to that end, shall fix and require uniform rates and fares, including the minimum and maximum to be charged by all such carriers for various kinds or classes of service. * * *"

"§ 60-1343. Appeal to district court. An appeal from any final order or judgment of the commission may be taken to the district court of Laramie County, Wyoming, or to the district court of the county in which appellants principal place of business is situated."

"§ 60-1314. Appeal — Time limit — Bond — Fee. Any person desiring to appeal shall within fifteen (15) days after rendition of such final order of judgment file with the commission a notice of appeal and shall, within said period, pay all costs of such hearing up to the time of such appeal or furnish good and sufficient bond in double the amount thereof to be approved by the commission and shall pay to the commission the sum of Five Dollars ($5.00) for making a transcript and allowing said appeal."

"§ 60-1345. Records certified to district court by com-

mission. Within fifteen (15) days after the filing of the notice of appeal and the payment of all costs, or filing bond as provided in Section 47 (§ 60-1343), hereof, the commission shall make copies of all documents, and pleadings forming the issue for the hearing before it and certify the same to said court together with its bill of costs."

§ 60-1346 requires docketing of the transcript by the clerk of the District Court; requires certain fees therefor to be paid and requires a notification of all parties to the proceeding relative to such docketing.

"§ 60-1347. Transcript of evidence filed by appellant— Time—Extension. The appellant shall within thirty (30) days after the docketing of such appeal file with said clerk a certified transcript of the evidence adduced at the hearing before the commission. The judge of said district court may, upon good cause shown, grant one extension of not to exceed thirty (30) days for the filing of such transcript."

"§ 60-1348. Service of appeal on respondents—Right to be heard—New evidence. Within ten (10) days thereafter the clerk of said court shall serve on all respondents by registered mail, a notice of said appeal having been so perfected. Any party to said hearing shall have the right to be heard on appeal before said district court upon giving notice thereof within fifteen (15) days after receipt of said notice, whereupon a hearing shall be held, otherwise, to be summarily disposed of by said district court. No new evidence shall be taken at such hearing except evidence of fraud in the procurement of such final order or decision and the parties shall appear in the district court as they did before the Commission."

"§ 60-1349. Findings of court. The judge of said district court shall determine (1) whether the commission acted without or in excess of its authority; (2) whether the final order or decision was procured by fraud; (3) whether the decision or final order is in conformity with law; and (4) whether the final order or decision is supported by substantial evidence."

"§ 60-1350. Judgment entered by court.—Said district court shall enter judgment confirming, modifying or remanding such final order or decision back to the Commission for further proceedings in conformity with the direction of said court."

"§ 60-1351. Appeals to supreme court — Appeals may be taken from any judgment of said district court to the Supreme Court of the State of Wyoming in accordance with the provisions of the Code of Civil Procedure."

Inasmuch as no new evidence was, so far as we can discover, submitted by appellants to the district court we may fairly conclude that there was no fraud asserted to be involved in connection with the procurement of the final order of the Commission. Indeed, we do not understand any claim of that kind to be advanced. Whether the final order aforesaid was the result of the Commission's acting without or in excess of the authority granted it by law, though not assigned as a ground of appeal to the district court, that question appears to be now urged here, and we shall give this matter due consideration herein. It may be observed that the district court decided adversely to appellants on all of the four points suggested in Section 60-1349 supra, as shown by its order set forth below. The amended judgment and decree of affirmance dated September 29, 1952, of the District Court of Laramie County, omitting its title in this matter, reads:

### "AMENDED JUDGMENT AND DECREE OF AFFIRMANCE

"This matter coming on to be heard before the court on appeal from the Public Service Commission of Wyoming on the 18th day of September, 1952, the applicant appearing by Mr. John U. Loomis of Loomis & Lazear, Cheyenne, Wyoming, and Mr. W. H. Fitzpatrick of Omaha, Nebraska; and the protestants appearing by their attorneys, Mr. George F. Guy of Cheyenne, Wyoming, and Mr. J. Reul Armstrong of Rawlins, Wyo-

ming; and the court having considered the record, including the transcript of the evidence, and having heard the arguments of counsel, and having considered the provisions of Section 60-1349 Wyoming Compiled Statutes, 1945, and being fully and sufficiently advised in the premises, finds:

"1. That the following Orders of the Public Service Commission of Wyoming appealed from should be affirmed, that:

"(1) Order denying Petition of Common Carrier Division, Wyoming Trucking Association for permission to intervene and to be heard at a re-opened hearing dated January 7th, 1952:

"(2) Order approving Application of the Union Pacific Motor Freight Company for Certificate of Public Convenience and Necessity dated January 8th, 1952.
"2. That the Commission did not act without authority, or in excess of its authority in making such orders or either of them.

"3. That the orders or decisions were not procured by fraud.

"4. That such orders or decisions and each of them are in conformity with law.

"5. That such orders or decisions are supported by substantial evidence.

"WHEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that such Orders of the Public Service Commission of Wyoming be and the same are hereby affirmed, to which the protestants except and are here severally allowed an exception.

"Dated this 29th day of September,¹ 1952."

It seems to be asserted by appellants that the applicant herein is not a common motor carrier. This is said because of the definition of a common motor carrier contained in § 60-1302 subdivision (n) supra, stress being laid upon the words in that section "who holds himself out as being willing to undertake for hire such

transportation," (i.e. transportation of property.) It is said that the applicant does not hold itself out for this purpose. While it is not shown what portion of the amount collected by the railroad is paid over to the applicant it must be assumed that the latter receives some of it, else how could it function at all? It undoubtedly h'as employees to whom it must pay salaries and also has expenses for the operation of its vehicles which must be met. The fact that it proposed to use Union Pacific freight depots and Union Pacific billing including Union Pacific employees in handling freight does not prevent its "holding itself out" to the public as an instrumentality which transports freight over regular routes with fixed termini.

In Vincent v. United States (Mun. App. D. C.) 58 A. (2d) 829, 831, it is said:

"A definition of the term 'holding out' appears in Northeastern Lines, Inc., Common Carrier Application, 11 M.C.C. 179 (1939):

" 'Question arises as to the meaning of the words "holds itself out," as applied to a common carrier. They clearly imply, we believe, that the carrier *in some way* makes known to its prospective patrons the fact that its services are available. This may be done in various ways, as by advertising, solicitation, or the establishment in a community of a known place of business where requests for service will be received. However the result may be accomplished, the essential thing is that there shall be a public offering of the service, or, in other words, *a communication of the fact* that service is available to those who may wish to use it.' (p. 182.)" (Emphasis already supplied.)

We cannot overlook either the statement in the Wyoming Constitution Article 10, § 7, (W.C.S. 1945, Vol. 5, p. 46), which declares:

"§ 7. Common carriers, who are. *All corporations engaged in the transportation of persons, property,* min-

eral oils, and mineral products, news or intelligence, including railroads, telegraphs, express companies, pipe lines and telephones, are declared to be common carriers." (Italics supplied.)

If it be argued that at the time our Constitution was written and adopted automobiles were unknown the following excerpt from our case of Pellish Bros. v. Cooper, 47 Wyo. 480, 483, 38 P. (2d) 607 is of aid in rejecting the contention as follows:

"Tie plants were not in existence at the time of the adoption of the constitution, and it was contended that they could not, accordingly, be considered as embraced within the terms of Section 10, Article 15, of the Constitution. We said on that point: .

" 'We might say in that connection, before proceeding farther, that it is apparently argued by counsel for the defendant that tie-preserving plants were not in use in 1889; that they were not in the contemplation of the framers of the Constitution or of the people; and that they cannot, accordingly, be considered as embraced in, or contemplated by, the section of the Constitution now under consideration. This contention, we think, is too broad. The section is a part of our organic law. The Constitution is, in a sense, a living thing, designed to meet the needs of progressive society amid all the detail changes to which such society is subject. State v. Keating, 53 Mont. 371, 163 P. 1156; Henshaw v. Foster, 9 Pick., (Mass.) 312. Hence, though tie-preserving plants were not in existence at the time of the adoption of the Constitution, still, if it can be said that the language used in the section under consideration, naturally construed, may fairly be said to embrace them, we would not be justified in excluding them therefrom merely for the reason that they were not in existence at the time of the adoption of the Constitution. 12 C.J. 703, 704.'

"It may be that the rule should not be as broad in the case of a statute. But it is well settled that things not existing at the time of the enactment of a law may be held to be within its terms in cases in which it deals with a genus of things."

Viewing § 60-1302 subdivision (n), as quoted, in the light of the constitutional designation concerning what corporations are to be regarded as common carriers, we have very little doubt that the applicant herein must be regarded as a common motor carrier.

It is urged that the order of the Commission granting a Certificate of Convenience and Necessity to the applicant was not in conformity with law and contrary to law. Specifications of Error IV and V; in other words, that the Commission's order last mentioned authorized the applicant to act without and contrary to the law of this state. It is said also that the Court's order aforesaid was "unsupported by substantial evidence." Yet, in appellant's brief in this court we find this language used: "While it is true some 15 shipper witnesses appeared in behalf of the Applicant, it is also true and the evidence is not disputed, that the Protestants were already furnishing *motor carrier* (Italics already supplied) service over all of the routes sought by the applicant and that the *Protestants offered to join with the applicant in through routes and to thereby furnish in practical effect a combined truck-rail operation which would give the shipping public all of the benefits claimed for such combined truck-rail service by the Applicant.* (Italics supplied.) (Transcript pages 60-187, 60-206, 60-227, 60-304.) However, the applicant declined for various reasons we do not believe to be substantial, to go along, and the Commission was persuaded by such reasons."

In short the appellants were willing to join with the railroad in an effort to furnish the general public with a combined rail-truck service which they now strenuously insist is contrary to law and not in conformity with law. Appellants' position would seem to be somewhat contradictory on this point. We believe the Commission acted wisely in granting the applicant a Cer-

tificate of Public Convenience and Necessity. It recognized the fact, as many courts have pointed out, (see views of the Supreme Court of Iowa in Thomson v. Iowa State Commerce Commission et al, 235 Iowa 469, 15 N.W. (2d) 603, 604, 605, 608, 609, 610 and 611, infra, that such a service to be satisfactory to the general public engaged in using motor carriers for transporting goods in L.C.L. shipments must embody a "high degree of coordination of rail and truck service.")

The Commission evidently concluded this would be brought about only by closely coordinated service, where, as here, the truck service is controlled through a wholly owned subsidiary of the railroad. In the Iowa case the railroad itself sought and ultimately obtained a Certificate of Convenience and Necessity for the purpose of using a combined rail and truck service relative to L.C.L. shipments. It is easy to see that no contract between parties who have been in sharp competition for years could be drawn so as to obviate differences as to the manner of handling L.C.L. shipments; differences which could easily become so violent as to totally disrupt such an arrangement and render it a mere "scrap of paper."

In the Thomson case supra, the applicant was the Chicago and North Western Railway Co. It sought a Certificate of Public Convenience and Necessity to operate as a motor carrier of freight over ten specified routes between fixed termini. After several hearings of the matter the Iowa State Commerce Commission entered an order denying the application. This order was made by a divided commission, two members so ruling while one member dissented from that ruling. In reversing the action of the Commission the District Court of Polk County, Iowa, to which an appeal was taken by the railroad, that court described the service

proposed by the applicant railway company thus: (at pp 604 and 605 of 15 N.W. (2d) ):

"The court approved the following as a statement of the proposed service: 'Applicant merely proposes to improve an existing service through the utilization of motor vehicles in rendering a service which will be auxiliary to, supplemental of, and coordinate with the rail service. Applicant does not propose to invade territory of any other carrier. All of the points are stations on the rail line which applicant has served for years and is under obligation to continue to serve. Applicant merely proposes to improve that service in an endeavor to retain existing patrons, offering them a service more in keeping with their requirements under existing merchandising methods. To say that such service will adversely affect the operations of existing motor carriers is to admit superiority of the proposed service which protestants strongly deny.' "

Cf. the proposed operation of the applicant in the matter at bar as given by the testimony of Mr. Weedin, General Freight Service Manager of the Union Pacific Railroad Co., and Vice-President of the Applicant as taken from the abstract of the record as follows: "What is contemplated is the substitution of motor vehicles in lieu of box cars for handling some of the Union Pacific freight or express moved intra state traffic by motor vehicles between Union Pacific freight houses. Shipments from Cheyenne to the vicinity of Rock Springs would move by rail car to Rock Springs and then distributed by truck; if the shipment originates in Cheyenne with a destination between Laramie and Rawlins it move(s) by rail from Cheyenne to Laramie in the evening and there be picked up in a truck for distribution on the westbound run. Shipments for Saratoga and Encampment would be left in the front end of the trailer and come east about four o'clock in the morning to Wolcott and then to Saratoga and Encampment. The saving in days would run from one to as high

as three or four. Most shipments will receive a prior or subsequent rail haul. There would be no change in the handling from Cheyenne to Rock Springs or Laramie and between Laramie and Rawlins; there will be a prior or subsequent rail haul.

In June 1950 as a representative month there were 54 shipments that would not have received a prior or subsequent rail haul if our proposed service were in operation. Of those 54 shipments, 25 were shipments moving from Rock Springs to the mine districts. The other 29 shipments weighed slightly over 12,000 pounds or about 545 pounds per day for the 22 working days that had not received a prior or subsequent rail haul. To provide a rail haul on the 29 shipments would nullify the benefits of the contemplated plan. The railroad does not feel that it should run a car every day for a few hundred pounds—we would rather accumulate them and use one car maybe every three or four days. That system accounts for some of the delays that the shippers have testified about. The contemplated service would use the same rates that are now used in shipments in rail cars. We use rail rates for our inter-state movements. Train delays have been substantially reduced when the train is relieved of stops to unload or pick up L.C.L. shipments. The general character of freight traffic through Wyoming is largely transcontinental. We have few, if any, local trains as such. When a freight train is stopped to unload merchandise the trainmen must open the car and get the merchandise out and re-seal it. It usually takes 15 to 20 minutes. There is delay in re-gaining momentum and expense for additional fuel to recover the speed. Often such freight trains must pull into a siding to avoid interference with other trains. Quite frequently such stopping delays other important train movements. Many times the west bound trains carrying livestock cars

pulling out of Laramie may have a merchandise car on the train and where they encounter these 15 or 20 minute delays, there is delay in the arrival of stock cars which may mean that the stock cannot be loaded to make a connection. It costs in excess of $10 to stop a train. Passenger trains sometimes stop at these small stations to deliver express which would be eliminated by the new plan."

The foregoing statement is made much more detailed by this witness's testimony on four subsequent pages of the abstract but to set it out here would needlessly extend this opinion.

Recurring again to the Thomson case, supra, the Commerce Commission and the Truck Carriers appealed the District Court of Polk County judgment of reversal to the Iowa Supreme Court. There, in an elaborate and cogent opinion that court affirmed the reversal judgment of the Polk County District Court stating in part that: (pp 608-9)

"The testimony introduced in support of the application herein comprises over 100 pages of the printed record. In addition thereto, a large number of exhibits have been certified to us. This record definitely establishes that the kind of service proposed is highly desirable, distinctly beneficial and reasonably necessary to the public welfare. That it is a special service, merely auxiliary to, or supplemental of the rail service is demonstrated by the testimony of Geo. W. Hand, chief executive officer of the railroad, as follows:

" 'We propose to combine truck hauls with rail hauls. Most of this freight will still be moved the greater part of the way by rail. * * * The movement of freight will be only between freight stations and not directly either to shippers or receivers. It will be picked up at one freight house and delivered at another and is essentially an entirely different type of service from that performed by motor carriers generally. These movements of freight will be under bills of lading of the railway

and the charges will be at applicable rail rates and tariffs.

" 'It will be performed under the supervision, direction and control of the same personnel of the railway that supervises, directs and controls the railway train, station pickup and delivery service in this area so that there will be complete and perfect coordination between truck operations and train operations and station service. *For the service to be satisfactory and yield the benefits it is capable of in full measure a high degree of coordination is essential. This can only be brought about where it is completely under the control of the railway management in every respect.'* * * * (Italics supplied.)

"In the case of Pennslyvania Truck Lines, Inc., Acquisition of Control of Barker Motor Freight, Inc., 1 M.C.C. 101, 111, the Commission states:

" 'The proof is convincing that over some of the routes in question the railroad can "use service by motor vehicles to public advantage in its operations." The motor vehicle can undoubtedly be used as a very valuable auxiliary or adjunct to railroad service, particularly less-than-carload service, and the many opportunities for such use here have been pointed out of record and are clear. *Such coordination of rail and motor-vehicle operations should be encouraged. The result will be a new form of service which should prove of much public advantage.* Nor do we believe that the creation of this new form of service will "unduly restrain competition." On the contrary, it should have the opposite effect.' " (Italics supplied.)

and the court stated further at pp 610-611:

"The pronouncements above quoted have been repeatedly recognized and applied. The following cases are illustrative: Seaboard A.L. Ry. Co. Operation, 17 M.C.C. 413; Mo. Pac. Ry. Co. Application, 22 M.C.C. 321; K.C. So. Transp. Co. Application, 28 M.C.C. 5; Ill. Cent. Ry. Co. Extension, 30 M.C.C. 477; C. & N. W. Ry. Co. Extension, 31 M.C.C. 455; Pac. Motor Truck Co. Application, 34 M.C.C. 249; C.M. & St. P. Ry. Co. Extension, 34 M.C.C. 475; Seaboard A.L. Ry. Co. Ex-

tension, 34 M.C.C. 511; Seaboard A.L. Ry. Co. Extension, 34 M.C.C. 725; Ill. Cent. Ry. Co. Extension, 41 M.C.C. 211, Mo. Pac. Ry. Co. Extension, 41 M.C.C. 241; Pac. Motor Truck Co. Extension, 41 M.C.C. 469.

"Of course, the decisions of the Interstate Commerce Commission are not binding precedents upon this court. However, the principles, announced and applied in the foregoing decisions, are so eminently fair, sound, just and reasonable that we have no hesitancy in adopting them as tenets which should be applied in determining whether the commission should have issued a certificate of public convenience and necessity under the facts herein. We have carefully examined the numerous cases, cited by the Iowa Commission. None is in point or persuasive and certainly none is in any way decisive or controlling. The length of this opinion forbids a detailed analysis thereof. We are satisfied that, when the Iowa Commission shut its eyes to the basic principles, repeatedly recognized and applied by the Interstate Commerce Commission, it thereby disregarded the substantial rights of the applicant railroad. Its decision became manifestly unsound, unfair, arbitrary and unreasonable."

In view of what was said by the Iowa Supreme Court relative to decisions of the Interstate Commerce Commission we now refer to the case of Interstate Commerce Commission v. Parker, 326 U.S. 60; 65 St. Ct. 1490, 89 L.Ed. 2051, as considered by the Supreme Court of the United States. The matters before that court were appeals by the Interstate Commerce Commission, the Willett Company of Indiana Inc., and the Pennsylvania Railroad Company as well as the United States Government. The appeals arose out of an action by Parker, doing business as Parker Motor Freight, et al, vs. United States, et al, to enjoin the enforcement of an order of the Interstate Commerce Commission which granted applications by the Willette Company of Indiana Inc., a motor carrier and a wholly owned subsidiary of the Pennsylvania Railroad Company, for

a Certificate of Convenience and Necessity for certain routes paralleling the lines of the railroad in Northern Indiana and Southern Michigan. The district court of the United States for the Southern District of Indiana, granted the injunction sought as above. In reversing the action of that court the United States Supreme Court stated in part (at pp 1491 and 1492, 65 S. Ct.) :

"The applications were granted after findings that Willett would render service auxiliary to and supplemental of the Pennsylvania's service in the transportation of less-than-carload freight. The service is to be rendered on railroad billings and is to employ railroad fixed and clerical facilities. The Commission found that Willett's service would be coordinated with the rail service and under railroad supervision. 42 M.C.C. 725; 21 M.C.C. at 407. It also found that the present and future public convenience and necessity required those motor carrier operations.

"In accordance with the policy of the Commission in granting certificates to railroad motor carrier affiliates to improve the service of the railroad, the Commission limited the carrier to service which is auxiliary to or supplemental of the rail service of the Pennsylvania. It forbade service to 'any point not a station on a rail line of the railroad,' and took steps to keep the Commission informed of the contractual arrangements between Willett and the Pennsylvania.

"While the routes paralleled the lines of the Pennsylvania in northern Indiana and the southern peninsula of Michigan, the authorization to Willett forbade the transportation by applicant as a common carrier of any shipments from Fort Wayne, Indiana, to Grand Rapids, Michigan, or through or to or from more than one of said points. The purpose of this limitation was to restrict Willett to transportation truly supplemental or auxiliary to the rail traffic. The two cities are breakbulk or key points. Less-than-carload freight comes to or leaves them in carload lots. When a mixed carload reaches one of these key points, the contents are distributed to the smaller, intermediate points of destination as way-freight by 'peddler' cars. The Willett Com-

pany seeks to take over this 'peddler' work and not to do over-the-road trucking. *Such motor-rail coordination has proven successful in improving service and reducing carrier costs.* (Italics supplied.) * * *

(and at pages 1494-5) "Common management of railroad and trucks gave promise of better cooperation than would be obtained by arms-length contracts or agreements. While the evidence shows that there were operating truck lines in the area which individually could serve all the way-stations by securing extensions to their present routes, it also shows that no motor carrier is now in a position to render this complete service. Cf. Kansas City S. Transport Co., Inc., Com. Car. Application, 10 M.C.C. 221, 232. The Commission on this evidence had a basis to conclude that a railroad subsidiary offered the most satisfactory facilities for making less-than-carload deliveries to way-stations. * * *

"We think that it was for a motor service to improve an existing rail service. Consequently, the issuance of the certificate is subject to all the requirements of any other application for a certificate for operation of motor lines. Since, however, on adequate evidence the Commission found that the motor service sought was of a different character from the existing motor service and not directly competitive or unduly prejudicial to the already certificated motor carriers, 42 M.C.C. 725, 726, we hold that the Commission had statutory authority and administrative discretion to order the certificate to issue. The public is entitled to the benefits of improved transportation. Where that improvement depends in the Commission's judgment upon a unified and limited rail-truck operation which is found not 'unduly prejudicial' to motor carrier operations, the Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service. * * *

"In the absence of power to compel coordination between the modes of transportation and in the presence of the probable gains in operative efficiency from unified management, we think the Commission, in view of the limitations on the railroad's motor service, is entitled

to conclude that the public will be better served by the rail operation than by use of the available motor carrier facilities. The alternative to the existence of this discretion is that the language of the Interstate Commerce Act, part II, forbids the granting to railroads of a certificate of convenience and necessity for the operation of motor trucks, under specially limited certificates, when there are certified motor carriers, independent of railroad authority or supervision, with whom arrangements for the service might be made by the rail carriers. There is no such prohibition in terms. Any such implication is negated by the discretion to grant certificates conferred on the Commission by the Act."

Many additional cases to the same effect as those herein above reviewed could easily be supplied.

It is contended that the Commission acted in the matter at bar "in excess" of its authority. We do not think so. When the provisions of § 60-1301, supra, setting forth the objectives of the law governing motor and common motor carriers, § 60-1304, supra, which states that "the power to supervise and regulate all common motor carriers is hereby delegated to the Commission"

§ 60-1306, supra, entire, as above set forth, and § 60-1308, supra, entire, as above set forth, we fail to see how such a contention has any merit. Broader statutory authorization in the premises vested in the Commission to regulate and control common motor carriers could hardly be conceived. The Commission has not, as we see it, gone beyond the powers that the Legislature of this state obviously intended to grant it. So far as the matter of rates and charges is concerned, the Commission certainly has power to fix the rail rate as the truck rate regarding L.C.L. intrastate shipments both as to minimum as well as maximum and thereby fully comply with the statutory requirements in that respect. If the railroad desires to file rate and charge schedules for both itself and its wholly owned subsidiary we cannot see why it may not do it.

Certain cases are cited by appellants on which it apparently relies: viz. Seaboard Air Lines R. Co., v. Commonwealth et al, 193 Va. 799, 71 S.E. (2d) 146, 149, 151. There, the Supreme Court of Virginia affirmed an order of the Commission of that state based on the ground that under the evidence submitted before it no public convenience and necessity had been shown for joint truck and rail service and consequently the certificate therefor could not be granted. In the opinion of the court in that cause we find this said:

"Seaboard also says that it would be expensive, and impracticable for it and the present certificated carriers to attempt to render a co-ordinated service by use of each other's facilities. *It asserts that performance of the necessary operating details to render the proposed service satisfactory and economical demands that it exercise exclusive supervision and control over the contemplated undertaking.* It is unwilling to attempt such co-ordinated service along this line." (Italics supplied.)

and the court also remarked: (at page 151)
"Whether or not public convenience and necessity require rendition of the service offered is an issue addressed to the sound discretion of the Commission. Jessup v. Commonwealth, 174 Va. 133, 5 S.E. 2d 482, Virginia Stage Lines v. Commonwealth, 186 Va. 1066, 45 S.E. 2d 318."

When it is remembered that in the case at Bar the Wyoming Public Service Commission found exactly contrary to what the Virginia Commission did, viz. that public convenience and necessity required the issuance of such a certificate to the applicant here, if we apply to the case at bar the rule mentioned by the Virginia Supreme Court as above that the issue of such a certificate is "an issue addressed to the sound discretion of the Commission," then we should rightly affirm the district court's order affirming the order of the Wyoming Public Service Commission.

The main reliance of the appellant here seems to be on the case of Rock Island Motor Transit Co. v. Murphy Motor Freight Lines, Inc., decided August 5, 1949, and reported in 229 Minn. 291, 40 N.W. (2d) 896. In that case, an appeal by the Transit Co., it was held in syllabus 8 and 9 p. 897:

"8. The powers and duties of Railroad and Warehouse Commission with respect to regulation of common carriers by motor vehicle and regulation of railroads are prescribed by separate statutes enacted at different times and there is no statutory authorization for the regulation of combined rail-truck service. M.S.A. §§ 216.01 et seq. 217.01 et seq., 218.01 et seq., 219.01 et seq., 221.01 to 221.17.

"9. Certificate of public convenience and necessity which authorized auto transportation company to transport from station to station along described route, pursuant to agreement with railroad, less-than-carload lots of freight delivered to railroad for shipment by rail, transporting such goods under railroad bills of lading and at railroad rates was invalid as in excess of powers of Railroad and Warehouse Commission. M.S.A. §§ 221.01 to 221.17, 221.04."

In that case also the Rock Island Motor Transit Co., had presented an application to the Minnesota Railroad and Warehouse Commission for a certificate of public convenience and necessity. This was opposed by Murphy Motor Freight Lines, Inc. The decision of the Minnesota Commission was in favor of the Transit Co. and the Murphy Motor Freight Lines, Inc., carried an appeal to the district court of Ramsey County, where the order of the Commission was affirmed. From that judgment, the Murphy Motor Freight Lines appealed the cause to the Supreme Court of Minnesota with the result above set forth. After the reversal of the district court's judgment by the Supreme Court of Minnesota the cause came back once more to the Railroad and Warehouse Commission. It was there again considered

although no additional evidence seems to have been submitted before the Commission and on May 8, 1953, after an order of the Commission had again been framed in favor of the Transit Co., and affirmed by the district court aforesaid, the cause came before the Supreme Court of Minnesota once more on appeal by the Murphy Motor Freight Lines, Inc. On the date last mentioned that court held that, (58 N.W. (2d) 723, 724), Syllabus 9 and 10:

"9. Where Railroad and Warehouse Commission has authority to issue unrestricted certificate of public convenience and necessity for motor carrier, Commission may issue restricted certificate, if restriction is in conformity with law and does not exceed Commission's jurisdiction. M.S.A. § 221.01 et seq.

"10. Certificate of public convenience and necessity which was issued to motor carrier and which required carrier to transport only such property as is tendered by certain railroad and prohibited carrier from rendering any service to stations on described routes which were not stations on such railway and which provided that shipments should be transported under terms and conditions of carrier's own bills of lading and that rates charged should be rates prescribed by Railroad and Warehouse Commission for motor carriers was valid. M.S.A. § 221.01 et seq."

We find considerable difficulty in reconciling the holdings of the Supreme Court as we have set them out above. It may be observed, however, that the personnel of the Court between August 5, 1949, and May 8, 1953, had been changed. The opinion appearing under date of August 5, 1949, being written by a justice different from the one who spoke for the court in the decision of May 8, 1953, aforesaid. The justice who wrote the opinion dated August 5, 1949, took no part in the consideration or decision of the case as finally decided on May 8, 1953. It may be noted also that the Transit Co. was a wholly owned subsidiary of the Rock Island Rail-

road Company. At any rate the result finally attained by the Minnesota Supreme Court would seem to be in harmony with the result which the district court of Laramie County reached in the instant case. We observe that the appellants and protestants here have submitted no comment on the later decision of the Minnesota Supreme Court. It may be further pointed out that the powers of the Wyoming Public Service Commission are, as we have seen, more inclusive and if possible broader than those of the Minnesota Commission. The ultimate result in the Minnesota litigation would seem in final analysis to be one contrary to the contentions of appellants here.

It is insisted that the Commission's decision now before us is not supported by substantial evidence. We are unable to see that this is so. A shipper forwarding freight along the Union Pacific Railroad lines testified, as set out in appellants' abstract of the record, as follows: "he lives in Cheyenne and is a salesman for Asher-Wyoming covering the State of Wyoming as far west as Rawlins and as far north as Wheatland, Torrington and Guernsey. They are not using the railroad service at present. They use their own trucks because the rail service is not fast enough. They have no objection to the common carrier truck service. Gallagher's service to Rock River and Medicine Bow is not satisfactory because shipments from Cheyenne move to Rawlins and are delivered on the back haul to Laramie. He understood the proposed service, which he says would be a big convenience for the reason that his truck does not go to the Town of Encampment, hence he would be able to make sales at Encampment and Riverside. They would use the proposed service between Laramie and Rawlins.

The witness testified that they would not use the proposed coordinated service entirely. They would con-

tinue their own truck service, but for the delivery of merchandise of which they were short of in Cheyenne when their own truck left, it could be delivered on the applicant's truck when the merchandise arrived. They would continue to use their truck once a week. The reason the Gallagher service to points between Rawlins and Laramie was unsatisfactory he said was because of the delay of half a day and maybe a day. The company has used Gallagher's service once or twice in the last six weeks. Some of the case goods and glassware have arrived in a damaged condition. He thinks that the damages were incurred by duplicate handling. He believes that the railroad employees will handle the merchandise more satisfactorily. He doesn't know whether the damage claims were paid by Gallagher or not. He doesn't attend to the claims department. They use Gallagher perhaps once a month.

All of Asher-Wyoming movements are in intra-state commerce. They have not solicited business in Encampment because the cost of running their own truck there is prohibitive. They have five accounts in Rock River, 1 in McFadden, 4 in Medicine Bow, 2, in Hanna, 7 or 8 in Rawlins and 4 in Saratoga. Their truck leaves Cheyenne Monday at nine o'clock and returns Tuesday night. He solicits the business on Wednesday and Thursday so that delivery of the merchandise solicited is delayed four or five days.

Even though the railroad has not been doing any trucking for Asher-Wyoming, the witness has travelled for 35 years and he knows the service of the railroad to be superior to that given by trucks because they watch the men a little more closely and when it is damaged they hear about it. He thinks the railroad truckers will be efficient and that there will be less damage when the railroad handles the trucks than when the truckers handle them."

Many other witnesses gave testimony of similar purport. It is quite obvious, we think, that there is ample substantial evidence to authorize the Commission to make the findings and the orders it did. It would seem to be idle to contend otherwise for where there was testimony which conflicted with the testimony submitted by the successful applicant the Commission was at liberty to disbelieve it.

A contention has been advanced that the Common Carriers Division of the Wyoming Trucking Association's petition for intervention was erroneously overruled. Concerning this contention it is sufficient to say that the matters which the proposed intervenors would offer in evidence would seem to have all been substantially laid before the Commission already. To have granted the petition for intervention would have resulted in a longer and much more extended transcript embracing matters which the Commission would and did examine in connection with the case of the Gallagher Transfer & Storage Co. and would for the most part be repetitious.

However, if we should be mistaken in this there is no reason that occurs to us why the Common Carrier Division of the Wyoming Trucking Association, Inc., may not apply independently to the Commission, and upon making a proper showing, be heard and obtain a ruling from the Commission concerning any question it may deem proper to present regarding the application of the Union Pacific Motor Freight Co. herein involved and aside from those urged by Gallagher Transfer & Storage Co.

In City of Pittsburgh v. Pennsylvania Public Utility Commission, 153 Pa. Sup. Ct. 83, 33 A. (2d) 641, 642, where a petition for intervention by the City of Pittsburgh was denied by the Commission and on appeal to

the Superior Court, seven judges sitting, the Court said:

"In our opinion, there is nothing in the Public Utility Law or in the decisions construing it which requires the Commission to permit appellant to intervene in the Commission's proceedings and the order of the Commission must be affirmed.
and the Court also observed:

"Questions of procedure, including the question whether parties should be allowed to intervene in one another's proceedings, are subordinate to the paramount functions of the Commission and should be left to its discretion so long, of course, as it observes the basic requirements designed for the protection of private as well as public interest."

In Holmes v. Republic Steel Corporation of New Jersey (Ohio App.) 64 N.E. (2d) 426, 427, 428, the court said:

"In 30 Ohio Jurisprudence, page 800, it is stated: 'Generally speaking, the granting of an application by one to be made a party defendant to a pending action rests in the discretion of the trial court.' "

There is nothing disclosed in the Wyoming Public Service Commission's disposition of the petition to intervene by the Common Carrier Division of the Wyoming Trucking Association aforesaid which we can see transgresses the "basic requirements" mentioned in the excerpt given above.

In this connection, it may be noted that the petition upon which the Wyoming Public Service Commission aforesaid ruled was not filed until several months after the hearing before the Commission in this matter was concluded and it also appears that four of the protestants in the hearing at Rawlins, and who introduced evidence before the Commission, were and are members of the Division aforesaid.

Without extending this opinion further to an unreasonable length, it is sufficient to say that after a careful and painstaking examination of the record herein—notwithstanding it is an unusually serious state of disrepair and extremely difficult to handle expeditiously—we are obliged to conclude that the judgment of the district court of Laramie County was correct and it should be, in all things, affirmed.

*Affirmed.*

BLUME, C. J., and HARNSBERGER, J., concur.